United States District Court
Southern District of Texas
**ENTERED**
September 14, 2016
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

| | | |
|---|---|---|
| QUIRINO MACHIN SANCHEZ, | § | |
| | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 7:15-CV-045 |
| | § | |
| LORIE DAVIS,[1] Director, Texas Department | § | |
| of Criminal Justice, Correctional Institutions | § | |
| Division, | § | |
|      Respondent. | § | |
| | § | |

## REPORT AND RECOMMENDATION

Petitioner Quirino Machen Sanchez, represented by retained counsel, initiated this action by filing a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. (Docket Entry No. 1.) In 2010, a Texas jury convicted Petitioner for possessing marijuana in an amount greater than 2,000 pounds. The trial judge sentenced Petitioner to ten years' imprisonment. After unsuccessfully availing himself of state appellate and post-conviction review, Petitioner now seeks federal habeas corpus relief.

Petitioner claims that his appellate counsel rendered ineffective assistance by failing to raise various issues on direct appeal. He also asserts claims based on the court reporter's failure to transcribe some bench conferences during trial and on alleged prosecutorial misconduct during closing argument. Respondent has filed a motion for summary judgment contending that Petitioner's claims lack merit. (Docket Entry No. 9.)

---

[1]     Effective May 1, 2016, Lorie Davis replaced William Stephens as the Director of the Correctional Institutions Division of the Texas Department of Criminal Justice. Pursuant to Rule 25 of the Federal Rules of Civil Procedure, Davis "is automatically substituted as a party." Fed.R.Civ.P. 25(d).

After carefully considering the parties' pleadings and the state court record in light of the applicable law, including the deferential standard of review mandated by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), the undersigned concludes that Petitioner has not shown a basis for federal habeas corpus relief. Petitioner has failed to show that the state habeas court unreasonably applied the *Strickland* standard denying his claims that his appellate counsel rendered ineffective assistance of counsel on appeal. Similarly, Petitioner has not shown that the state court unreasonably applied clearly established federal law in denying his other claims. Accordingly, for the reasons explained further below, the undersigned recommends that the District Court grant Respondent's motion for summary judgment and deny habeas relief. It is further recommended that the Court not issue a certificate of appealability.

## I. BACKGROUND

### A.    State Court Proceedings

On August 18, 2009, a confidential informant advised an FBI agent that a tractor-trailer may have been loaded with narcotics at a warehouse in Hidalgo County, Texas.[2] The informant gave the agent detailed information identifying the tractor-trailer, including (among other things) the Florida license plate numbers for both the truck and the trailer. The informant indicated that the tractor-trailer was no longer at the warehouse and that it was last seen near a particular hotel. The FBI agent passed the information on to Texas Department of Public Safety narcotics agents.

DPS narcotics agents began looking for the tractor-trailer and soon found it at the hotel. They conducted surveillance as the tractor-trailer left the hotel and entered a highway headed north. The narcotics agents requested assistance from DPS highway patrol officers. Trooper

---

[2]     The facts and procedural history are taken from the State Court Record filed in this case (Docket Nos. 3, 4), the documents submitted by Petitioner and Respondent, and the Thirteenth Court of Appeals' decision addressing Petitioner's direct appeal, *Sanchez v. State*, No. 13-10-00619-CR, 2011 WL 5844518 (Tex. App.-Corpus Christi-Edinburg Nov. 22, 2011).

Enrique Cantu stopped the tractor-trailer on the highway after observing that its mud flaps were "sailing" too far off the ground, which he believed to be a traffic violation.

Julio Luis Narango Iglesias was driving the tractor-trailer and his co-driver, Petitioner Quirino Machin Sanchez, was in the passenger seat. Both Petitioner and Iglesias were licensed commercial truck drivers. They had driven from Florida to Texas ostensibly to pick up a load of Del Monte fruit cups. The trailer was equipped with a refrigeration unit. Petitioner and Iglesias were to transport the fruit cups to Montville, Pennsylvania. Iglesias, the owner of the tractor-trailer, kept log books for their activities.

DPS officers spoke with Iglesias and Petitioner separately. The men provided inconsistent information about their trip and otherwise acted suspiciously. For example, Petitioner claimed that he did not know his co-driver's surname, though they had worked together for some time. Iglesias consented to allow DPS officers to search the tractor-trailer. Officers entering the trailer detected the odor of marijuana. They discovered approximately 2,400 pounds of marijuana bundled and concealed within the pallets of fruit cups.

A Hidalgo County grand jury indicted Petitioner on one count of possession of marijuana in an amount of more than 2000 pounds. *See* TEX. HEALTH & SAFETY CODE ANN. § 481.121 (West 2010). Petitioner stood trial in the 430th Judicial District Court for Hidalgo County, Texas in cause number CR-1624-10-J. Sergio Valdez and Nereida Lopez ("trial counsel") represented Petitioner in the trial court proceedings. Before trial, trial counsel filed motions to suppress Petitioner's post-arrest statements and the evidence seized pursuant to the police search. Trial counsel also strenuously sought disclosure of the confidential informant's identity.

At trial, the State's evidence included the testimony of Oscar Perez, a warehouse supervisor for Loop Cold Storage, located in McAllen, Texas. Loop Cold Storage is a

warehouse facility in the business of storing fruits, vegetables, and foods for Del Monte and other customers. Perez described the procedure for loading a tractor-trailer at their warehouse. He also explained safety and security measures taken at Loop Cold Storage, including the placement of security cameras throughout the facility. No one has ever alleged that drugs were loaded into a truck at Loop Cold Storage, and the security cameras would have recorded anyone attempting to do so.

Perez was on duty at Loop Cold Storage on Monday, August 17, 2009, when the tractor-trailer driven by Petitioner and Iglesias was loaded with pallets containing cases of fruit cups. After loading the trailer with 30 pallets, the trailer doors were closed and a seal was placed on the doors to insure the integrity of the load. Based on Perez's testimony, the jury could reasonably have concluded that the marijuana found in the tractor-trailer the next day (Tuesday, August 18, 2009) was not loaded at Loop Cold Storage.

The State also presented the testimony of Steven Whitham, who had about 30 years' experience as a commercial truck driver. Whitham described several ways in which individuals engaged in illegal activity could bypass a seal on trailer doors in order to open the doors without breaking the seal.

Whitham also explained the requirement for commercial truck drivers to maintain an accurate log book. The log books for Petitioner and Iglesias showed that they left Miami, Florida, on August 15, 2009, bound for Corpus Christi, Texas. Along the way, they took turns driving and resting in the tractor's sleeper berth. They did not go to Corpus Christi, but instead arrived in Edinburg, Texas, on Sunday evening, August 16, 2009. The logs show that both Petitioner and Iglesias then spent over 12 hours in the sleeper compartment, presumably resting. Petitioner was in the sleeper until noon on Monday, August 17, and then he drove the truck from

Edinburg to McAllen to pick up their load.  His log book indicated that this trip took three hours. According to the log books, both Petitioner and Iglesias were then in the sleeper of the tractor from Monday night until 8:00 a.m. on Tuesday, August 18, 2009.  Beginning after 8:00 a.m. on Tuesday, the logs indicate that Petitioner was "on duty, not driving."  Iglesias was also "on duty, not driving" starting at 8:00 a.m., with a log notation indicating that he had fixed a transmission problem.

According to his log book, Petitioner was in the sleeper compartment for about 16 hours after they obtained the load of fruit from Loop Cold Storage.  Whitham stated that this load required that the refrigeration unit on the trailer remain running and that running the unit for 16 hours was expensive (in terms of fuel consumption).  Whitham's testimony also illustrated why drug traffickers need to be careful about the drivers they use for their loads of narcotics.  As an example, he described an incident in which a driver delivered what he thought was a legitimate load to its intended destination (a Wal-Mart distribution center), only to discover when the doors were opened that someone had added drugs to the load.  Needless to say, law enforcement was contacted and the drugs were seized.

After Petitioner and Iglesias were stopped by DPS Troopers at around 1:00 p.m. on Tuesday, August 18, 2009, they were questioned about their activities leading up to the traffic stop.  Although the log books indicated that both Petitioner and Iglesias were in the sleeper compartment the previous night, Petitioner claimed that they had slept in a hotel that night because they were tired.[3]  Petitioner said nothing about any repairs to the tractor-trailer that morning.

---

[3]     Whitham testified that the appropriate log entry would have been "off-duty" if indeed they stayed in a hotel (rather than the notation showing that they were in the "sleeper berth").

The jury heard testimony from law enforcement officers with training and experience in narcotics trafficking. This evidence showed that the 2,472 pounds of marijuana found in the tractor-trailer was worth about a million dollars and that its value would have increased as it was transported to cities farther north in the United States. The officers explained the methods used by drug traffickers to transport drugs using tractor trailers, which often involve a number of different individuals performing various roles (such as packaging, loading, driving, etc.).

Although Petitioner's trial counsel vigorously cross-examined the State's witnesses, Petitioner elected to present no evidence. During closing argument, the prosecutor argued that the circumstantial evidence showed that Petitioner knew that drugs were in the trailer. Petitioner's counsel argued that the State had shown nothing more than that Petitioner was present in the tractor-trailer where the marihuana was found and that "mere presence" did not make him guilty. Counsel criticized the State's lack of investigation on several key points, emphasizing that there was no evidence to show where the marijuana was loaded or who loaded it.

At the conclusion of the three-day trial, the jury found Petitioner guilty beyond a reasonable doubt. The trial court assessed Petitioner's punishment at ten years' imprisonment and imposed a $10,000 fine.

Florencio Lopez ("appellate counsel") represented Petitioner in the Court of Appeals for the Thirteenth Supreme Judicial District. Appellate counsel raised one claim relating to the trial court's failure to require disclosure of the confidential informer's identity. The intermediate appellate court affirmed in an unpublished memorandum opinion. *Sanchez v. State*, No. 13-10-00619-CR, 2011 WL 5844518 (Tex. App.-Corpus Christi-Edinburg Nov. 22, 2011). Petitioner's

conviction became final on December 22, 2011, when the time for filing a petition for discretionary review expired.[4]

On December 17, 2012, Petitioner filed a state application for habeas relief in the trial court raising the same arguments he now advances on federal review.  On July 7, 2014, the trial court signed findings of fact and conclusions of law recommending the denial of habeas relief. (Docket Entry No. 1-3, Appendix at 19.)  The Texas Court of Criminal Appeals initially issued an order dismissing Petitioner's habeas application, but later withdrew that order and entered one denying the application.  With regard to the merits of Petitioner's habeas claims, the Court of Criminal Appeals' order summarily stated: "Based on our own independent review of the record, we conclude that Applicant's claims are without merit."  *Ex parte Sanchez*, No. WR-80,826-02 (Tex. Crim. App. Jan. 28, 2015).

**B.    Federal Review**

Petitioner Sanchez filed a timely federal petition for a writ of habeas corpus raising the following grounds for relief:

1.    The court reporter's failure to transcribe some bench conferences denied Petitioner's right to meaningful appellate review.  (Claim One).

2.    Appellate counsel provided ineffective representation by failing to argue that

   (a)    the State's failure to disclose the identity of the confidential informant violated procedural due process, the duty under *Brady v. Maryland*, 373 U.S. 83 (1963), and the Confrontation Clause (Claims Two through Four);

---

[4]  Petitioner's co-driver, Iglesias, was charged with the same drug offense and tried separately. The State presented essentially the same evidence during Iglesias' trial.  The jury in his case likewise found him guilty.  Iglesias' appellate counsel raised a number of issues on appeal, including issues that Petitioner now faults his appellate counsel for not asserting.  The Thirteenth Court of Appeals rejected Iglesias' arguments and affirmed his conviction.  *See Iglesias v. State*, 2013 WL 209226 (Tex. App.-Corpus Christi-Edinburg Jan. 17, 2013).

(b)     the trial court erred in denying Petitioner's motion to suppress because the police allegedly did not give sufficient *Miranda* warnings (Claim Six);

(c)     the trial court violated the Fourth Amendment in denying Petitioner's motion to suppress drug evidence (Claim Seven); and

(d)     the evidence was insufficient to support Petitioner's conviction (Claim Eight).

3.     The State engaged in prosecutorial misconduct during closing arguments. (Claim Five).

Petitioner submitted a lengthy supplemental brief in support of his claims. (Docket Entry No. 1-2; hereinafter cited "Brief at ___".)   Respondent has filed an answer and motion for summary judgment. (Docket Entry No. 9.)  Petitioner has filed a reply addressing Respondent's arguments. (Docket Entry No. 12).  This matter is ripe for adjudication.

## II.  LEGAL STANDARDS

The writ of habeas corpus provides an important, but narrow, examination of an inmate's conviction and sentence. *See Harrington v. Richter*, 562 U.S. 86, 103 (2011); *Barefoot v. Estelle*, 463 U.S. 880, 887 (1983).  "Society's resources have been concentrated at [a criminal trial] in order to decide, within the limits of human fallibility, the question of guilt or innocence of one of its citizens." *Wainwright v. Sykes*, 433 U.S. 72, 90 (1977); *see also McFarland v. Scott*, 512 U.S. 849, 859 (1994) (stating that a "criminal trial is the 'main event' at which a defendant's rights are to be determined").  The States, therefore, "possess primary authority for defining and enforcing the criminal law.  In criminal trials they also hold the initial responsibility for vindicating constitutional rights." *Engle v. Isaac*, 456 U.S. 107, 128 (1982).

If the inmate has presented his federal constitutional claims to the state courts in a procedurally proper manner, and the state courts have adjudicated their merits, AEDPA provides for a deferential federal review.  "[T]ime and again," the Supreme Court "has instructed that

8

AEDPA, by setting forth necessary predicates before state-court judgments may be set aside, 'erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court.'" *White v. Wheeler*, 136 S. Ct. 456, 460 (2015) (quoting *Burt v. Titlow*, 134 S. Ct. 10, 16 (2013)). Under AEDPA's rigorous standard of review, an inmate may secure relief only after showing that the state court's rejection of his claim was either "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1),(2).[1] A federal habeas court must also presume the underlying factual determinations of the state court to be correct, unless the inmate "rebut[s] the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

Petitioner Sanchez raised each of his claims on state habeas review. The lower court issued explicit findings and conclusions recommending the denial of each claim. The Texas

---

[1]     Inmates arguing legal error in state court decisions must comply with § 2254(d)(1)'s "contrary to" and "unreasonable application" clauses. *See Bell v. Cone*, 535 U.S. 685, 694 (2002). A petitioner does not merit relief by merely showing legal error in the state court's decision. *See White v. Woodall*, 134 S. Ct. 1697, 1702 (2014) (stating being "merely wrong" or in "clear error" will not suffice federal relief under AEDPA). In contrast to "ordinary error correction through appeal," AEDPA review exist only to "guard against extreme malfunctions in the state criminal justice systems . . . ." *Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015) (quotation omitted). "[F]ocus[ing] on what a state court knew and did," *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011), AEDPA requires inmates to "'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woodall*, 134 S. Ct. at 1702 (quoting *Richter*, 562 U.S. at 103); *Berghuis v. Thompkins*, 560 U.S. 370, 380 (2010); *Williams v. Taylor*, 529 U.S. 362, 413 (2000). "If this standard is difficult to meet, that is because it was meant to be." *Richter*, 562 U.S. at 102. A petitioner challenging the factual basis for a state decision must show that it was an "unreasonable determination of the facts in light of the evidence . . . ." 28 U.S.C. § 2254(d)(2); *see also Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). "[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010).

Court of Criminal Appeals denied Petitioner's grounds for relief on the merits, but did not adopt the lower court's recommendation. Instead, the Court of Criminal Appeals summarily denied all the claims. Generally, federal courts presume that "[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991); *see also Jackson v. Johnson*, 194 F.3d 641, 651 (5th Cir. 1999) ("When faced with a silent or ambiguous state habeas decision, the federal court should look through to the last clear state decision on the matter.").[5] Thus, when the Court of Criminal Appeals summarily rejects a prisoner's claim, federal courts can "ignore—and hence, look through—an unexplained state court denial and evaluate the last reasoned state court decision." *Bledsue v. Johnson*, 188 F.3d 250, 256 (5th Cir. 1999). Respondent, however, does not ask for deference to be paid to the lower court's findings and conclusions. Even so, AEDPA requires federal courts to defer to the Court of Criminal Appeals' summary decision to deny relief. *See Harrington v. Richter*, 562 U.S. 86, 99 (2011); *see also Johnson v. Williams*, 133 S. Ct. 1088, 1095 (2013) (observing that AEDPA deference is proper even in "instances in which a state court may simply regard a claim as too insubstantial to merit discussion"). Petitioner, therefore, must show that the state habeas court's denial of his claims was contrary to, or an unreasonable application of, federal law. *See* 28 U.S.C. § 2254(d)(1).

Petitioner's grounds for relief will be considered in light of these standards.

---

[5]    The *Ylst* Court explained:
> The maxim is that silence implies consent, not the opposite—and courts generally behave accordingly, affirming without further discussion when they agree, not when they disagree, with the reasons given below. The essence of unexplained orders is that they say nothing. We think that presumption which gives them no effect—which simply "looks through" them to the last reasoned decision—most nearly reflects the role they are ordinarily intended to play.

*Ylst*, 501 U.S. at 804.

### III. ANALYSIS

**A.      Meaningful Appellate Review (Claim One).**

Petitioner claims that the trial court violated his constitutional right to meaningful appellate review by failing to ensure the transcription of various bench conferences.  Under the Texas Rules of Appellate Procedure, a court reporter must "attend court sessions and make a full record of proceedings" unless the parties agree otherwise.[6] TEX. R. APP. PRO. 13.1.  Petitioner lists six bench conferences that were not transcribed and states that these bench conferences "dealt with substantial and significant procedural and evidentiary matters."  (Brief at 8, 10.) According to Petitioner, because he has shown that portions of the record were missing and necessary to pursue his appeal, "he was entitled to habeas relief even absent any showing of specific prejudice or error."  (Brief at 11.)

State "procedures used in deciding appeals must comport with the demands of the Due Process and Equal Protection Clauses of the Constitution."  *Evitts v. Lucey,* 469 U.S. 387, 393 (1985).  An appellate process satisfies those constitutional concerns by providing a criminal appellant the "minimum safeguards necessary" to make appellate review "adequate and effective."  *Smith v. Robbins,* 528 U.S. 259, 276–77 (2000).

The record on appeal must be "of sufficient completeness" to allow the appellant "proper consideration" of his claims.[7] *Mayer v. Chicago,* 404 U.S. 189, 194 (1971).  Thus, "[i]t is

---

[6]      Although Petitioner cited this state procedural rule in his opening brief (Brief at 9), he appears to acknowledge in his reply brief—as he must—that a violation of state law does not give rise to federal habeas relief.  (Docket No. 12 at 1.)  Indeed, the Supreme Court has "repeatedly held that 'federal habeas corpus relief does not lie for errors of state law.'"  *Wilson v. Corcoran,* 562 U.S. 1, 5 (2010) (quoting *Estelle v. McGuire,* 502 U.S. 62, 67 (1991)).  Petitioner emphasizes that "[t]he issue raised in *this* Court and in *this* proceeding is explicitly stated and argued as a constitutional one."  (Docket No. 12 at 1 (emphasis in original).)

[7]      The Supreme Court has addressed the availability of trial transcripts on appeal in a line of cases involving indigent criminal defendants.  In *Griffin v. Illinois,* 351 U.S. 12 (1956), the Court

indisputably true that a criminal defendant has the right to an adequate review of his conviction, *i.e.,* a sufficiently complete record." *Fahy v. Horn*, 516 F.3d 169, 190 (3d Cir. 2008) (citing *Mayer,* 404 U.S. at 198). However, as the Third Circuit has observed, "neither the Supreme Court, nor our Court, has held that due process requires a verbatim transcript of the entire proceedings or that an incomplete record confers automatic entitlement to relief."[8] *Fahy*, 516 F.3d at 190; *see also Karabin v. Petsock*, 758 F.2d 966, 969 (3d Cir. 1985) ("The Supreme Court has never held that due process requires a verbatim transcript of the entire proceedings."). Other federal courts have reached the same conclusion. The Sixth Circuit has explained:

---

applied the "constitutional guaranties of due process and equal protection" in holding that a state cannot make a trial transcript available to those who can afford it, but deny transcripts to those who are indigent. *Id.* at 19 ("[d]estitute defendants must be afforded as adequate appellate review as defendants who have money enough to buy transcripts"). *Mayer* involved an indigent defendant convicted on non-felony charges who was denied a transcript of his trial proceedings because a state court rule limited free transcripts to indigent defendants who were convicted on felony offenses. The Supreme Court ruled that the distinction between felony and non-felony offenses did not satisfy the requirements of the Fourteenth Amendment. *Mayer*, 404 U.S. at 195-96. Although the appellant was entitled to a "record of sufficient completeness," the Court emphasized that "[a] 'record of sufficient completeness' does not translate automatically into a complete verbatim transcript." *Id.* at 194. "*Griffin* did not impose an inflexible requirement that a State provide a full trial transcript to an indigent defendant pursuing an appeal." *M.L.B. v. S.L.J.*, 519 U.S. 102, 112 n.5 (1996). Whether an indigent defendant needs a complete transcript for an effective defense or appeal depends on: "(1) the value of the transcript to the defendant in connection with the appeal or trial for which it is sought, and (2) the availability of alternative devices that would fulfill the same functions as a transcript." *Britt v. North Carolina,* 404 U.S. 226, 433–34 (1971). In the instant case, Petitioner Sanchez does not suggest that he was indigent or that he was denied a transcript that would have been available had he been able to afford it. Although Petitioner does not claim unequal treatment based on indigence, he nevertheless was entitled to a "record of sufficient completeness" to permit proper consideration of his claims. *See Mayer*, 404 U.S. at 194.

[8]     The Ninth Circuit made the same observation in *Madera v. Risley,* 885 F.2d 646 (9th Cir.1989): "There is no Supreme Court or Ninth Circuit authority on the due process implications of a state court's failure to record portions of a criminal trial." *Id.* at 648. Such statements refute Petitioner Sanchez's contention that the Texas Court of Criminal Appeals unreasonably applied "clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). The constitutional right that Petitioner is asserting is not "clearly established" by Supreme Court precedent.

Although the Supreme Court has held that the due process clause is violated if an indigent defendant is denied a transcript, *Griffin v. Illinois*, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956) (plurality opinion), that a state may not block an indigent petty offender's access to an appeal afforded others, *Mayer v. Chicago*, 404 U.S. 189, 195-96, 92 S.Ct. 410, 30 L.Ed.2d 372 (1971), and that a new court-appointed attorney who represents an indigent attorney on appeal (but not at trial) is entitled to the entire trial transcript at public expense, *Hardy v. United States*, 375 U.S. 277, 279-80, 84 S.Ct. 424, 11 L.Ed.2d 331 (1964), it has never held that the absence of a portion of a trial transcript automatically entitles the defendant to a retrial. In fact, in *Mayer*, the Supreme Court acknowledged that a "complete" record did not necessarily require a verbatim transcript, so long as the state found another means of providing an adequate record. *Mayer*, 404 U.S. at 194, 92 S.Ct. 410. In other words, "*Mayer* does not stand for the proposition, implicit in [petitioner's] argument, that where a portion of a trial transcript is missing and unobtainable, and where a defendant makes a claim that could possibly implicate that portion of the transcript, a retrial is always necessary." *Scott v. Elo*, 302 F.3d 598, 604 (6th Cir.2002) (rejecting that the failure to transcribe a significant portion of the closing argument denied the petitioner due process).

*Jackson v. Renico*, 179 F. App'x 249, 252 (6th Cir. 2006).

Consistent with this understanding of Supreme Court precedent, a number of federal courts have concluded that "the absence of a perfect transcript does not violate due process absent a showing of specific prejudice." *White v. State of Fla., Dep't of Corr.*, 939 F.2d 912, 914 (11th Cir. 1991) (holding that the § 2254 petitioner "failed to demonstrate how the defective suppression hearing transcript prejudiced his direct appeal"). In reaching this conclusion in *White*, the Eleventh Circuit agreed with the reasoning of cases decided in the Sixth Circuit and the Eighth Circuit. *Id.; see Bransford v. Brown*, 806 F.2d 83, 85 (6th Cir.1986) ("in order to demonstrate denial of a fair appeal, petitioner must show prejudice resulting from the missing transcripts"); *Mitchell v. Wyrick*, 698 F.2d 940, 941 (8th Cir. 1983) ("Mere absence of a perfect transcript does not necessarily deny one due process of law."). The Tenth Circuit has likewise recognized that a "petitioner must allege some prejudice resulting from the failure to supply a complete record on appeal." *Harden v. Maxwell*, No. 00-7032, 2000 WL 1208320 *1 (10th Cir. Aug. 25, 2000) (citations omitted) (holding that "no federal due process violation occurred"

based on failure of state trial court to include jury instructions in record where the petitioner merely alleged that he was deprived of the opportunity to have the state appellate court review the instructions); *see also Madera v. Risley*, 885 F.2d 646, 648–49 (9th Cir.1989) (applying *Britt* criteria and holding that the petitioner "was not prejudiced by the lack of recordation [of various potions of his trial] and is not entitled to habeas corpus relief based on a due process violation").

The Fifth Circuit has taken the same approach.  In *Green v. Johnson*, 160 F.3d 1029 (5th Cir. 1998), a state prisoner convicted of capital murder sought federal habeas relief on the ground (among others) that "no record was either made or preserved at various stages of the pretrial hearing on a motion to suppress or the bench conferences during trial." *Id.* at 1045.  The Fifth Circuit held that "barring a showing that the alleged violation resulted in 'actual prejudice,' . . . habeas relief is unwarranted." *Id.* (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

Similarly, in *Schwander v. Blackburn*, 750 F.2d 494 (5th Cir. 1985), the Fifth Circuit addressed a state prisoner's claim that he was denied the right to a meaningful appeal where a "substantial portion of the trial record" was unavailable to his attorney on appeal (who was not the same attorney who had represented him at trial).[9] *Id.* at 497.  Noting that the petitioner did not "contend that the omitted portions of the transcript contain any additional error," the Fifth Circuit agreed with the district court that "the omitted phases of the trial transcript are immaterial to the error alleged by [the petitioner] on direct appeal" and ruled that the petitioner was "not denied a meaningful appeal." *Id.* at 498. *See also Kunkle v. Dretke*, 352 F.3d 980, 985 (5th Cir. 2003) (rejecting a state habeas petitioner's claim that his due process rights were violated because the trial court provided only a partial transcript of the voir dire; petitioner failed to

---

[9]     In that case, the trial transcript omitted "the jury voir dire, opening and closing statements of counsel, jury instructions and additional jury questions." *Id.* at 497.

14

"allege any error that may have been uncovered" through production of the missing portions of voir dire).[10]

Notwithstanding the legal authority outlined above, Petitioner Sanchez insists that the court reporter's failure to record the bench conferences violated his right to meaningful appellate review, regardless of whether he has shown any specific prejudice. (Brief at 9.) In support of this proposition, Petitioner principally relies on the Fifth Circuit's ruling in *United States v. Selva*, 559 F.2d 1303, 1305 (5th Cir. 1977). Petitioner's reliance on *Selva* is misplaced, however, since that decision was based on application of the federal Court Report Act, 28 U.S.C. § 753. As the Eleventh Circuit explained in *White*, "*Selva* and it progeny do not address petitions by state prisoners to federal courts for writs of habeas corpus."[11] 939 F.2d at 914 n.4. *See also Madera*, 885 F.2d at 648 n.1 (noting in a § 2254 action by a state prisoner that cases decided under the Court Reporter Act were inapposite because "that Act does not apply to state court proceedings").

---

[10]     In *Kunkle*, the Fifth Circuit noted that the state is not required "to furnish complete transcripts so that the defendants . . . may conduct 'fishing expeditions' to seek out possible errors at trial." *Id.* at 985-86 (quoting *Jackson v. Estelle*, 672 F.2d 505, 506 (5th Cir. 1982)).

[11]     Because *Selva* was decided prior to the creation of Eleventh Circuit from the old Fifth Circuit, *Selva* is also binding precedent in the Eleventh Circuit. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1211 (11th Cir.1981) (adopting as binding precedent all decisions of the old Fifth Circuit rendered prior to October 1, 1981). In his reply brief, Petitioner argues that in *Selva* the Fifth Circuit cited and relied upon *Hardy v. United States*, 375 U.S. 277 (1964), which, as the Fifth Circuit noted, "involved no violation of the Court Reporter Act." (Docket No. 12 at 1-2 (quoting *Selva*, 559 F.2d at 1305 n.3). It is true that *Hardy* did not involve a violation of the Court Reporter Act; rather, at issue there was a practice by a United States Attorney's office to furnish indigents with a full trial transcript only if the cost to the United States was less than $200. *Hardy*, 375 U.S. at 278. While the ruling in *Hardy* was not based on a violation of the Court Reporter Act, neither was it based on the constitutional right to meaningful appellate review. The Supreme Court made this clear, stating: "We deal here only with the statutory scheme and do not reach a consideration of constitutional requirements." *Id.* at 282. Thus, *Hardy* cannot be read as establishing a constitutional standard regarding the availability of complete transcripts on appeal in criminal cases.

Petitioner's claim fails because he has failed to establish that he was prejudiced as a result of the imperfect trial transcript. His trial counsel became aware during trial that the bench conferences were not being recorded, yet counsel did not request that any matters addressed during the bench conferences be put on the record—even though the trial court offered to do so.[12] (Docket No. 3-18, Reporter's Record Vol. 8 at 122-23.) In support of his federal habeas claim, Petitioner merely describes the subject of the missing bench conferences and makes the conclusory assertion that they "dealt with substantial and significant procedural and evidentiary matters." (Brief at 7-8, 10.) He does not identify any viable claims that appellate counsel could not develop due to the absence of a transcript of the bench conferences, which is fatal to his claim.[13] *Green*, 160 F.3d at 1045 (habeas relief based on missing bench conference transcripts is "unwarranted" where there was no showing of "actual prejudice"); *see also Kunkle*, 352 F.3d at 985 (no due process violation where petitioner "argue[d] generally that he may have been able to uncover an error of constitutional magnitude had he been provided a complete transcript"); *Schwander*, 750 F.2d at 497-98 (finding no constitutional error when "the omitted phases of the trial transcript are immaterial to the error alleged by [the petitioner] on direct appeal"). Nor does Petitioner link those bench conferences to any issue raised on state appellate review, state habeas review, or in this forum. Petitioner has fully briefed his federal habeas claims, and there is no

---

[12]    After learning from the court reporter that the bench conferences were not being recorded, Petitioner's trial counsel raised this issue with the court. (Docket No. 3-18, Reporter's Record Vol. 8 at 122-23.) For reasons that are not clear from the record, the court reporter was apparently unable to record the bench conferences. (*Id.* at 122.) The court advised Petitioner's counsel that if he wanted any bench conference recorded, counsel would "need to tell us so we can excuse the jury." (*Id.* at 123.) Trial counsel did not request to put on the record any matters discussed in bench conferences prior to that point, nor did he request that any subsequent bench conference be put on the record.

[13]    For example, Petitioner indicates that several of the bench conferences addressed the admissibility of various exhibits. (Brief at 8.) Yet he does not suggest that the trial court erred in admitting any of those exhibits or explain how the absence of the bench conference transcripts prevented his appellate counsel from challenging those rulings.

indication that the missing bench conference transcripts affected his ability to assert these claims or any other viable claim.

In essence, Petitioner's argument is that his appellate counsel was prevented from reviewing bench conference transcripts to look for possible error.   Simply put, this is not prejudice of the sort that would give rise to a violation of the constitutional right to meaningful appellate review.   Petitioner's first claim should be rejected because he has failed to show that the state habeas court's rejection of this claim is contrary to, or an unreasonable application of "clearly established Federal law, as determined by the Supreme Court of the United States." *See* 28 U.S.C. § 2254(d)(1).

## B.   Ineffective Assistance of Appellate Counsel (Claims Two, Three, Four, Six, Seven, and Eight).

Petitioner raises six claims arguing that appellate counsel provided constitutionally deficient representation.   Petitioner faults appellate counsel for not raising claims relating to the failure to disclose the identity of a confidential informant (Claims Two through Four); the denial of Petitioner's motion to suppress (Claim Six and Seven); and the sufficiency of the evidence supporting his conviction (Claim Eight).   Courts assess an attorney's representation under the general conceptual framework set out in *Strickland v. Washington*, 466 U.S. 668, 686 (1984). Under *Strickland*, a criminal defendant's Sixth Amendment rights are "denied when a defense attorney's *performance* falls below an objective standard of reasonableness and thereby *prejudices* the defense." *Yarborough v. Gentry*, 540 U.S. 1, 3 (2003) (emphasis added); *see also Rompilla v. Beard*, 545 U.S. 374, 387 (2005); *Wiggins v. Smith*, 539 U.S. 510, 520 (2003). *Strickland*'s two-pronged test governs claims of ineffective appellate representation.   *See Blanton v. Quarterman*, 543 F.3d 230, 2 40 (5th Cir. 2008).

Federal law defers to an appellate attorney's selection of issues to litigate.  Counsel is "'strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'"  *Pinholster*, 131 S. Ct. at 1403 (quoting *Strickland*, 466 U.S. at 690); *see also Woods v. Etherton*, 136 S. Ct. 1149, 1151 (2016); *Burt v. Titlow*, 134 S. Ct. 10, 17 (2013).  "Appellate counsel need not raise every nonfrivolous appellate issue, but should instead select issues that will maximize the likelihood of success on appeal." *United States v. Redd*, 619 F. App'x 333, 337 (5th Cir. 2015).  To prove a reasonable probability of a different result on ineffective-assistance-of-appellate-counsel claims, an inmate "must show that with effective counsel, there was a reasonable probability that he would have won on appeal."  *Moreno v. Dretke*, 450 F.3d 158, 168 (5th Cir. 2006).

Petitioner asserted and exhausted his *Strickland* arguments on state habeas review.  While "[s]urmounting *Strickland*'s high bar is never an easy task[,]"  *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010), ineffective-assistance claims that the state courts have adjudicated on the merits warrant a "doubly deferential judicial review" under AEDPA.  *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009); *see also Cullen v. Pinholster*, 563 U.S. 170, 190 (2011) (applying "doubly deferential" standard in reviewing state court's denial of ineffective assistance of counsel claims).  A state court's adjudication of *Strickland* claims "must be granted deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself."  *Harrington v. Richter*, 562 U.S. 86, 101 (2011).  With that deference "[t]he question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard."  *Id.* at 105.

1.    **Failure to Raise Claims Relating to the Tip from a Confidential Informant (Claims Two and Three).**

The investigation into Petitioner's drug activity began with a tip from a confidential informant. Trial counsel filed a pre-trial request for production of the confidential informant's identity. Under Texas state law, the prosecution has the "privilege to refuse to disclose the identity of a person who has furnished information relating to or assisting in a criminal investigation," except when the trial court orders disclosure of the identity because the "informer may be able to give testimony necessary to a fair determination . . . on guilt or innocence." TEX.R.EVID. 508. On direct appeal, the intermediate appellate court provided the following description of the trial-level proceedings relating to disclosure of the confidential informant's identity:

> Sanchez filed a motion requesting that the trial court order the State to provide the informant's identity and address, claiming that the informant's testimony was "material to the defense on the issues of both guilt [and] innocence." Sanchez then filed a motion pursuant to Texas Rule of Evidence 508 requesting the State to disclose the identity of the anonymous tipster. *See* TEX.R. EVID. 508. Sanchez claimed that the anonymous tipster "ha[d] testimony necessary to a fair determination of one or more material issues in his criminal case." *See id.* R. 508(c)(2). On June 22, 2010, the trial court held a hearing on Sanchez's motion to reveal the identity of the confidential informant. Sanchez presented the testimony of Agent Javier B. Riojas and Agent Joseph A. Lopez in support of his motion.
>
> Agent Riojas, an agent with the DPS, testified that he received "second or third hand" information from another officer that a confidential informant, or a "C.I.," called in a report of suspicious activity. . . . Agent Riojas testified that, according to the federal agent [who passed along the tip],[14] the informant provided a

---

[14] The appellate court explained:

> When asked where the call occurred, Agent Riojas stated that he wasn't sure if the call was made to his supervisor, "Rolando's" or "Agent Lopez's" cell phone. Nonetheless, Agent Riojas, Lieutenant Rolando Villarreal, and Agent Lopez were all present when the call came in and the caller was placed on speakerphone, so that all present heard the conversation. On cross-examination by the State, Agent Riojas clarified that the call he heard was not from the C.I. but was from an agent from the federal government.

description with the license plate number of a vehicle involved in suspicious activity. The C.I. also provided information that the vehicle had been at a warehouse in Edinburg, Texas; however, according to Agent Riojas, the C.I. did not provide a physical address for the warehouse. According to Agent Riojas, the C.I. reported that "there was some kind of loading going on" and that the C.I. observed "what appeared to be a loading of mari[h]uana"; however, the C.I was unable to see whether the doors of the vehicle were removed because it was backed up into the warehouse. The C.I. stated that he had seen two men at the warehouse and that these men were the occupants of the vehicle. According to Agent Riojas, the C.I. "conducted one or two drive[-]bys and saw the truck at this suspicious location, with the doors closed ... and gave a pretty, detailed description of the truck." Agent Riojas elaborated that the C.I. was traveling on a public roadway "and was able to see observations taking place at this warehouse." The C.I. did not provide a description of either individual he allegedly saw. Agent Riojas stated, "It was basically—the easiest thing to describe would have been the big truck—the eighteen-wheeler—and that's what [the C.I.] did."

Agent Riojas testified that the purpose of speaking to a C.I. "is, basically, just gathering basic information for us to go in and start to corroborate, and gain our own information." On cross-examination, Agent Riojas stated that the information was used to establish surveillance of the vehicle and to begin an investigation. When asked, "Was there any material fact on guilt or innocence provided by this tip that would be relevant to this trial," Agent Riojas replied, "No, sir."

On re-direct examination, Sanchez's counsel asked, "Sir? Is it material who loaded the drugs into the tractor trailer? Is that material or not?" Agent Riojas responded, "No." Agent Riojas then explained that he "never said that [the C.I.] was there [at the warehouse] whenever any mari[h]uana was being loaded." Agent Riojas agreed that it was an important part of his investigation to determine the identity of the men loading the marihuana; however, the officers "were never able" to make that determination based on the C.I.'s information. Instead, once the officers "found out [about the C.I.'s information], a traffic stop was conducted . . . ." Agent Riojas stated that he was not claiming that Sanchez was one of the men loading the marihuana onto the vehicle and that "from the information that [the C.I.] gave [him], there is probably no way that [the C.I.] would be able to identify that either. Because ... he was driving by on a public road." Agent Riojas agreed that it was "possible" that the C.I. could identify the men he saw at the warehouse that day. On re-cross examination, Agent Riojas stated that the C.I. had only witnessed suspicious activity and that, based on the information he received, the C.I. could not identify the two individuals the C.I. saw that day.

Lopez, an agent with the Border Patrol, testified that he heard a telephone call at the DPS office made by an "FBI agent." Agent Lopez clarified that the phone call

---

*Sanchez v. State*, No. 13-10-00619-CR, 2011 WL 5844518, at *1 (Tex. App.-Corpus Christi-Edinburg Nov. 22, 2011).

was not from the C.I. but was from an FBI agent and that neither he, nor Agent Riojas nor Lieutenant Villarreal spoke with the C.I. The information was "second-hand." Agent Lopez stated, "Basically, the information was relayed to the lieutenant. We had him, basically, on speaker phone and it was [a] description, and possible location of the vehicle." The information also included the vehicle's license plate number and that it was located at the vicinity of a Super 8 motel. Agent Lopez testified that he did not receive any information regarding the loading or unloading of drugs at a warehouse.

Sanchez's counsel argued that it was unknown whether the C.I. could identify the men he saw at the warehouse and that Sanchez may not have been the man loading the drugs onto the vehicle. He also argued that the agents failed to ask the C.I. whether he could identify the men he saw that day. The trial court stated:

> But [the C.I.] couldn't identify the defendants. There is no evidence that I have that the C.I. could identify the defendants, that [the C.I.] knew that there was mari[h]uana. There is just suspicions that [the C.I.] reported to law enforcement, that [the agents] followed up and corroborated. I don't have a record that says that you [Sanchez] met your burden to show me—what you need to show me—for me to disclose.
>
> . . .
>
> They couldn't even identify this defendant. Had they received information that it was this individual, and it fit his description and all that. The only thing they could do [defense counsel], from the testimony that I have before me, is that there was a description of the vehicle, an eighteen wheeler, plates, and license plates from Florida and that it was close to a Motel [8]. And that was it.
>
> . . .
>
> Right now the information that I have—the information that the informant provided has nothing—no testimony that was necessary to the fair determination of the issue of guilt of this defendant. He couldn't identify him. He didn't know him from Adam.
>
> . . .
>
> If the rule was the way you say, then I would have to order the government to disclose the informant in every, single case. And, obviously, they'd have to dismiss the case because they don't want somebody to go blow them away, and kill them before they testify. That's the reason for these rules. . . .
>
> You have to make a specific showing. You have to show all of these different things, and that's the only way I can order them disclosed, and I don't think that you have met your burden.

The trial court then asked the State to determine whether the identity of the C.I. was known. The trial court stated, "Find out. I will—the Court is ready to make a

decision. I'm going to overrule your motion to disclose the informant at this time. I'm going to grant you [Sanchez] the right—I'm going to have the State inquire whether they have the name of that informant, and I'll conduct an in camera inspection of the affidavit, or the information, or—you know—make a record of it, if there is such a person, so we can have the identity."

*Sanchez v. State*, No. 13-10-00619-CR, 2011 WL 5844518, at *1-2 (Tex. App.-Corpus Christi-Edinburg Nov. 22, 2011).  The DPS agent and Border Patrol agent testified at trial without identifying the confidential informant.

On direct appeal, Petitioner challenged the non-disclosure on different grounds than those advanced now on federal habeas review.  Petitioner premised his appellate challenge on the Texas evidentiary rule that required an *in camera* review and disclosure when the informant may be able to provide testimony necessary to a fair determination of a material issue.  *See Bodin v. State*, 807 S.W.2d 313, 317–18 (Tex. Crim. App. 1991).

The appellate court found no error under state law.  The appellate court observed that "[w]hen information from an informant is used only to establish probable cause for a search warrant and the informant was not a participant in the offense or present when the search warrant was executed, the identity need not be disclosed because the informant's testimony is not essential to a fair determination of guilt; rather, it is only relevant to a determination of probable cause." *Sanchez*, 2011 WL 5844518, at *4.  Here, because the informant's tip only provided a background for the surveillance of the tractor-trailer, "the informer's testimony was relevant only for a determination of why the agents began their investigation of the vehicle.  Moreover, no evidence was presented that the informant was a participant in the charged offense or present when the agents conducted the search of the vehicle." *Id.*  The appellate court noted that Petitioner only speculated that the informant could provide any evidence relating to culpability, particularly because "no evidence was presented that the informant knew the identities of the

men who were allegedly loading the eighteen-wheeler with marihuana. In fact, the agents testified that the informant could not identify those men." *Id.* Thus, "[t]he evidence provided shows that the informant's information in this case was not used to establish Petitioner's identity or to establish that he possessed the marihuana." *Id.* Simply, Petitioner "failed to show that the informant's testimony was necessary to a fair determination of guilt or innocence." *Id.*

Petitioner claims that appellate counsel would have been successful on appeal if, instead of challenging the lack of disclosure of the informant's identity under state evidentiary rules, appellate counsel had done so by citing procedural due process and the duty under *Brady*. Petitioner, however, has not shown *Strickland* prejudice with regard to those arguments.

*Strickland* requires a showing of actual prejudice, which in the context of an ineffective-assistance-of-appellate-counsel claim asks whether, but for counsel's allegedly unreasonable failure to raise the indicated claims, "he would have prevailed on his appeal." *Smith v. Robbins*, 528 U.S. 259, 285 (2000). The prism through which the appellate court would consider each challenge to the confidential informant's testimony informs *Strickland*'s prejudice prong on these claims. *Strickland* prejudice augments the fact that the appellate courts would have to find harm or prejudice flowing from the absence of the confidential informant's testimony under each constitutional theory proposed by Petitioner. *See United States v. Bagley*, 473 U.S. 667, 682 (1985) (requiring an inmate raising a *Brady* claim to show "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different"); *Davis v. Mann*, 882 F.2d 967, 975 (5th Cir. 1989) ("[T]o establish a denial of procedural due process, petitioner must show substantial prejudice" stemming from the deficiency.").

In essence, Petitioner premises his arguments on the theory that "the Confidential Informant could have excluded Petitioner as one of the two individuals seen loading marijuana

into the back of the tractor-trailer and in so doing disprove the Government's attempt to infer that Petitioner had knowledge that it was there." (Brief at 2.) Petitioner points out that the confidential informant provided the federal agent with the license plate number for both the tractor and the trailer. From this, Petitioner hypothesizes:

> Because the trailer plate is displayed only on the back of the trailer, 12 RR 10-11, if the CI was in a position to observe the trailer plate while the trailer was backed up to a warehouse loading dock he was a material witness for the defense because he was also in a position to observe and identify the two individuals loading the marijuana and exclude Sanchez as one of them, 13 RR 16-19.

(Brief at 14.)

The appellate court, however, stated that "no evidence was presented that the informant knew the identities of the men who were allegedly loading the eighteen-wheeler with marihuana. In fact, the agents testified that the informant could not identify those men." *Sanchez*, 2011 WL 5844518, at *4. Because Petitioner relied only on "[m]ere conjecture and speculation," the appellate court explicitly rejected Petitioner's argument that the identity of the informant "may have been relevant to his guilt or innocence."[15] *Id.*

---

[15] Petitioner attempts to bolster his position by arguing that the state trial court "itself acknowledged the need for an *in camera*" hearing regarding the confidential informant, yet the court "failed to conduct one." (Brief at 14 (citing Hearing at 50).) But this does not tell the full story. At the conclusion of a pre-trial hearing addressing the defense's motion to disclose the confidential informant, the trial court denied the motion. The court nevertheless directed the State inquire if there was an affidavit or other information regarding the informant, and, if so, the court would conduct an in camera inspection of that information in order to make a record. (Docket No. 3-32, Suppl. Reporter's Record at 49-53.) After the conclusion of the first day of trial, the court asked the prosecutor if he had found out whether there was an affidavit or other statement by the informant; the prosecutor advised the court that there was no recorded statement from the informant. (Docket No. 3-16, Reporter's Record Vol. 7 at 197.) The court indicated that the issue would be re-visited the next day. (*Id.*) After hearing additional argument the next morning, the trial court ruled that "no disclosure is necessary at this time" and that the court was "not going to require any further information." (Docket No. 3-17, Report's Record Vol. 8 at 9.) In other words, after further consideration, the trial court concluded that an in camera review was not necessary.

In denying Petitioner's state habeas application, the Texas Court of Criminal Appeals implicitly adopted the findings of the trial court and the appellate court. Petitioner falls far short of showing that this finding reflects an "unreasonable determination of the facts." 28 U.S.C. § 2254(d)(2). Petitioner's license plate theory is not convincing. He suggests that the confidential informant must have observed the trailer license plate from within the warehouse since the plate is on the back of the trailer and the trailer was backed in to the loading dock. But this ignores the testimony, as noted by the state appellate court, that the confidential informant observed the tractor-trailer from a vehicle on a public road. *Sanchez*, 2011 WL 5844518, at *1-2. The informant could easily have observed the license plate on the trailer as it was pulling into the warehouse or leaving the warehouse.[16]

Petitioner has not made any stronger showing on federal review that the confidential informant would have been able to exclude him from being one of the men loading the tractor-trailer with marijuana.[17] With that weak foundation, appellate counsel would not possess a

_____

[16]    The agents also testified that the confidential informant indicated that the tractor-trailer had left the warehouse and was seen at a particular hotel. From this, the state court could reasonably have inferred that the informant had followed the tractor-trailer to the hotel and would thus have had opportunity to observe the license plates in this way as well.

[17]    The state courts also could have reasonably concluded that the confidential informant's testimony would not likely have resulted in Petitioner's acquittal, even if the confidential informant had testified that Petitioner was not one of the men he/she saw at the warehouse where the drugs were presumably loaded. At Petitioner's trial, neither the state's evidence nor the prosecutor's argument suggested that Petitioner was personally involved in loading the drugs into the tractor-trailer. During closing argument, the prosecutor acknowledged that the agents did not know where the drugs were loaded into the trailer or who loaded it. (Docket No. 3-21, Reporter's Record Vol. 9 at 68.) Rather, the prosecutor argued—based on the circumstantial evidence—that Petitioner knew that he and Iglesias were transporting drugs at the time they were stopped by the DPS Trooper. The prosecutor pointed to evidence suggesting that Petitioner was "part of the team" that likely involved other individuals who participated in packaging the drugs within the pallets of fruit cups and then loading the drug-laden pallets back into the trailer. (*Id.* at 74.) If the confidential informant had testified that he/she did not see Petitioner at the second warehouse, the prosecutor would likely have pointed out that, according to Petitioner's log book, he never left the tractor-trailer during the time between when the fruit cup pallets were loaded at

substantial argument under the federal constitutional theories (due process and *Brady*) that the trial court erred in refusing to order the State to disclose the identity of the confidential informant. Put another way, Petitioner has not shown a reasonable probability that the result of the appeal would be different had appellate counsel raised the same arguments he does on federal review. It follows that Petitioner has not shown that the state habeas court was unreasonable in denying his ineffective assistance claims relating to appellate counsel's failure to challenge the non-disclosure of the confidential informant's identity. *See* 28 U.S.C. § 2254(d)(1).[18]

## 2.    Failure to Raise Claim Based on Confrontation Clause (Claim Four).

Petitioner also argues that appellate counsel provided ineffective representation by failing to claim that the admission of the confidential informant's out-of-court statements violated the Confrontation Clause. Trial counsel moved to suppress any testimony about the confidential informant's tip. The trial court issued a written order denying that motion. (Docket No. 3-7, Clerk's Record at 88-91.) The trial court found that testimony about the tip was not hearsay

---

Loop Cold Storage and the next day when they were stopped by the DPS trooper. Also, if Petitioner was not present at the second warehouse, it is likely that the prosecutor would have pointed to this as additional circumstantial evidence of his guilt since it would mean that Petitioner and Iglesias had relinquished control of the tractor-trailer after it had been loaded with a valuable cargo of fruit.

[18]    While a finding of no *Strickland* prejudice is sufficient for the denial of habeas relief, *United States v. Kimler*, 167 F.3d 889, 893 (5th Cir. 1999), Respondent makes substantial alternative arguments for the denial of relief. As an initial matter, Texas requires "a party to preserve an issue for appellate review" by making "a timely objection with specific grounds for the desired ruling." *Livingston v. Johnson*, 107 F.3d 297, 311 (5th Cir. 1997). Petitioner has not shown that trial counsel preserved error with regard to each constitutional challenge he proposes in claims two and three. In addition, *Strickland* pays heavy deference to the decisions made by counsel. Here, counsel challenged the trial court's failure to require disclosure of the confidential informant's testimony, albeit under a different legal theory. Petitioner has not shown that appellate counsel's choice to focus on that argument was unreasonable in the constitutional sense. Finally, Respondent provides significant arguments demonstrating why the state habeas court would not be unreasonable in finding no deficient performance in not advancing each underlying constitutional claim.

because the State did not introduce it to "prove that the drugs were in the tractor trailer, but rather . . . to show why the investigator focused on the Defendant." (*Id.* at 89.) The testimony at Petitioner's trial regarding the confidential informant's out-of-court statements was limited to telling the jury that law enforcement agents received a tip that a particular tractor-trailer may be loaded with narcotics. This information was needed to explain why law enforcement officers began their surveillance of the tractor-trailer. The trial court concluded that the admission of this testimony did not violate the Confrontation Clause and was not hearsay because it was not offered for its truth; rather, it was admitted for the non-hearsay purpose of explaining the background police surveillance and investigation that culminated in the stop and search of the tractor-trailer. Clerk's Record at 90.

Petitioner has not shown that the state habeas court unreasonably applied *Strickland* in denying his claim that appellate counsel provided ineffective representation by not raising a Confrontation Clause challenge on appeal. The Confrontation Clause "has no application to out-of-court statements that are not offered to prove the truth of the matter asserted." *Williams v. Illinois*, 132 S. Ct. 2221, 2228 (2012); *see also Woods v. Etherton*, 136 S.Ct. 1149, 1152 (2016) ("The Confrontation Clause prohibits an out-of-court statement only if it is admitted for its truth."). The testimony about the confidential informant's tip was offered to provide background information regarding the course of the police investigation, and the trial court allowed the testimony solely on that basis—not for its truth. In fact, when reviewing a separate claim, the appellate court in this case stated that "[t]he evidence provided shows that the informant's information in this case was not used to establish Petitioner's identity or to establish that he possessed the marihuana . . . ." *Sanchez*, 2011 WL 5844518, at *4.

In his reply brief, Petitioner disputes the proposition that the evidence regarding the tip was just contextual, arguing that it is "ultimately belied by the prosecutor's opening and closing arguments where the substance [of] the CI's statements to authorities was urged as proof of wrongdoing." (Docket No. 12 at 8 (citing 7 RR 13-16 (opening argument), 9 RR 43 (closing argument)).)   Petitioner's argument is not persuasive in light of the applicable standard of review.

The record supports the state habeas court's implicit finding that the informant's tip was not admitted for its truth.   In addition to the trial court's written ruling, the trial court also addressed this issue during the trial (out of the presence of the jury) and explicitly ruled that the testimony regarding the tip was not hearsay because it was "not offered to prove that the drugs were in the tractor trailer, but it's offered to show you why the investigator was focusing on the eighteen-wheeler, and on the Florida license plates." (Docket No. 3-17, Reporter's Record Vol. 8 at 11.)   The trial court went on to specify what background information regarding the tip that the State would be allowed to present. (*Id.* at 12-14.)   While the prosecutor briefly referred to the information about the tip in his opening and closing statements, Petitioner's trial counsel did not object on the basis that the prosecutor had violated the trial court's ruling regarding limited purpose of that testimony.   The prosecutor never suggested that the anonymous tipster identified Petitioner; to the contrary, the prosecutor acknowledged in closing argument that the State did not know where the marijuana was loaded or who loaded it.   (Docket No. 3-12, Reporter's Record Vol. 9 at 68.)

The Supreme Court's recent per curiam ruling in *Woods* is particularly relevant here.   In that case, the state habeas court had rejected the petitioner's claims that his trial and appellate counsel were ineffective for failing to raise a Confrontation Clause challenge regarding an

anonymous tip. 136 S.Ct. at 1150-51. During the state court trial, three different police officers recounted the tip, which was that two white males were possibly carrying cocaine in a white Audi that was traveling on a specific highway. The prosecutor also described the tip during closing argument. The trial court admitted the testimony about the tip only as background to show why the officers followed and stopped the white Audi. On federal habeas review, the Sixth Circuit held that the petitioner's appellate counsel was ineffective in failing to raise a Confrontation Clause challenge. The Sixth Circuit reasoned that the contents of the tip were admitted for their truth because the tip was repeated by three witnesses and described during closing argument. The Supreme Court unanimously reversed the Sixth Circuit because it "did not apply the appropriate standard of review under AEDPA." 136 S.Ct. 1152. Contrary to the Sixth Circuit's ruling, the Supreme Court found that "[a] 'fairminded jurist' could conclude that repetition of the tip did not establish that the uncontested facts it conveyed were submitted for their truth." *Id.* This conclusion applies with equal force here.

Petitioner has failed to show either that appellate counsel was deficient in failing to raise a Confrontation Clause challenge to the trial court's admission of the informant's tip or that, had he done so, there is a reasonable probability that the result of the appeal would have been different. Because Petitioner has not shown that the state court adjudication of this claim was contrary to, or involved an unreasonable application of, federal law, his ineffective assistance claim regarding the Confrontation Clause should be denied. *See* 28 U.S.C. § 2254(d)(1).

### 3.   Failure to Raise Claims Relating to the Motion to Suppress (Claims Six and Seven).

Trial counsel unsuccessfully litigated two suppression motions in the trial court. Appellate counsel, however, did not raise any claims relating to those efforts. In his federal habeas petition, Petitioner claims that appellate counsel should have challenged the trial court's

denial of (1) his motion to suppress all post-arrest statements because he did not voluntarily, knowingly, and intelligently waive his rights (claim six) and (2) his motion to suppress the evidence seized from the tractor-trailer as the fruit of an unlawful stop (claim seven).  For the reasons discussed below, Petitioner has not shown that the state habeas court unreasonably applied federal law in denying those claims.

### a.    Post-Arrest Statements

Trial counsel filed a pre-trial motion to suppress Petitioner's post-arrest statements to police.  (Docket No. 3-6, Clerk's Record at 17.)  Petitioner does not dispute that he received the *Miranda* warnings in English or that he signed the written *Miranda* waiver form.  (Brief at 30-31.)  Petitioner, however, argues that the police did not properly warn him of his rights in his native language of Spanish.

During the trial proceedings, the trial court held a hearing on Petitioner's motion to suppress his post-arrest statements.  Although Petitioner had signed a written *Miranda* warning in English and initialed each part of the warning, trial counsel argued that Petitioner only would have understood the warnings in Spanish.  Both Agent Riojas and Agent Lopez testified that Petitioner was also given an oral *Miranda* warnings in Spanish.  However, their testimony was inconsistent concerning who read Petitioner his rights in Spanish.  Agent Riojas did not remember if he personally gave the warnings in English, but knew that he did not give the warnings in Spanish, "[s]o [he] kn[ew] Agent Lopez did the Spanish." Tr. Vol. 8 at 107.   Agent Lopez, on the other hand, testified that Riojas read Petitioner his rights in Spanish.  Tr. Vol. 8 at 115.  Agent Lopez stated that Petitioner's statements to them were "a mixture of Spanish and English." *Id*.  When asked if Petitioner's primary language was Spanish, Agent Lopez stated that "it was English and Spanish mixed." *Id*.

Trial counsel argued that (1) the contradictory testimony indicated that "neither one [of the officers] read the rights in Spanish" and (2) Petitioner could not have voluntarily, knowingly, and intelligently waived his *Miranda* rights because he does not understand English. Tr. Vol. 8 at 119.   However, no evidence was presented to show that Petitioner could not understand the warnings in English.   Trial counsel admitted that the testimony did not show that Petitioner could not understand English.   Tr. Vol. 8 at 120.   After hearing the agent's testimony and considering counsel's argument, the state trial court denied the motion to suppress.   Tr. Vol. 8 at 121.

Petitioner argues that appellate counsel should have claimed that the trial court erred in not suppressing his post-arrest statements.   Petitioner renews his argument that he could not have given a valid waiver of his *Miranda* warnings without being so informed in Spanish.   In particular, Petitioner contends that "Agent Riojas and Agent Lopez were the only officers present and both expressly denied having been the one to issue the verbal Miranda warning in Spanish." (Docket Entry No. 12 at 10.)   Petitioner, however, still does not provide any basis to find that he could not understand the *Miranda* warnings in English.   The police officers testified that Petitioner spoke to them in a mixture of English and Spanish, and trial counsel did not provide any evidence that Petitioner was not proficient enough in English to understand the form he signed.

Without an adequate evidentiary basis to argue that Petitioner signed the *Miranda* waiver form without understanding its contents, his appellate attorney cannot be faulted for failing to raise what would have been a weak challenge the waiver of his rights.   Moreover, given the agents' testimony that Petitioner spoke to them in a mixture of English and Spanish, Petitioner has failed to show that the state court made an unreasonable determination of the facts in finding

that Petitioner adequately understood the *Miranda* warnings he was given in English.[19]   For the

same reasons, Petitioner has not shown that the results of his appeal would have been different

had his appellate attorney raised the *Miranda* warnings issue.   The state habeas court was not

unreasonable in denying this ground for relief.   *See* 28 U.S.C. § 2254(d)(1).

b.      Seized Evidence

Petitioner challenged the seizure of the marijuana in a motion arguing that the police

lacked probable cause to stop the tractor-trailer.   Clerk's Record at 19-20.   The trial court

understood that "Sanchez argue[d] that the trooper followed and stopped the eighteen wheeler as

a 'pretext'" to search for the marijuana described by the confidential informant.   Clerk's Record

at 86.   Trooper Cantu had received the information provided by the confidential informant.

Cantu explained why he pulled over the tractor-trailer: "[a]s I observed the vehicle, I was—I was

observing that the vehicle had an improper back mud flap sailing against the wind. So I then

proceeded to conduct a traffic stop on said vehicle." (Docket No. 3-14, Tr. Vol. 7 at 28.)   He

also explained that "sailing" referred to mud flaps coming more than eight inches off the ground

while the vehicle was in motion. (Docket No. 3-15, Tr. Vol. 7 at 97–99, 114.)   Another trooper

confirmed that a "sailing" mud flap was a traffic violation. (*Id.* at 120-21.)

The trial court entered a written order denying the suppression motion the day after

Officer Cantu testified at trial.   The trial court provided two bases for its decision: Petitioner

"lack[ed] standing to challenge the legality of the search" and "the evidence demonstrates that

the traffic stop was reasonable as a reasonable officer in the same circumstances could have

---

[19]  Nor has Petitioner shown that the state court could not have reasonably found that the agents orally gave the *Miranda* warnings in Spanish. Although the agents' testimony was inconsistent about who gave the warning in Spanish, they both insisted that Petitioner was given *Miranda* warnings in Spanish. After hearing the agents' testimony and observing their demeanor, the trial court could have found that the agents gave Petitioner Miranda warnings in Spanish (as they both claimed), even though they could not remember who had done so.

stopped the vehicle for the alleged traffic violation . . . ." (Docket No. 3-7, Clerk's Record at 86–87.)

Petitioner claims that appellate counsel should have challenged the denial of the suppression motion. Petitioner disputes whether a "sailing" mud flap is a proper basis on which to conduct a traffic stop. According to his argument, the improper stop started a chain of events that resulted in the illegal seizure of the marijuana after co-defendant Iglesias consented to a search.

Petitioner, however, did not argue in state court that the initial stop was illegal because there was no traffic violation. Respondent observes that Petitioner litigated a "motion to suppress evidence obtained as a result of the stop . . . based on the pre-textual nature of the traffic stop. In other words, trial counsel challenged the officer's subjective motives for making the stop, without arguing that there was no objective basis (i.e., the traffic violation)." (Docket Entry No. 9 at 34.)[20] Because Texas strictly requires defendants to preserve error for appeal, *see Ex parte Chandler*, 182 S.W.3d 350, 356 (Tex. Crim. App. 2005), Respondent convincingly argues that appellate counsel could not have advanced the claim Petitioner proposes on federal review.

At any rate, Petitioner has not shown that appellate counsel missed a viable claim relating to the motion to suppress. The Fourth Amendment protects "against unreasonable searches and seizures," U.S. CONST. AMEND. IV. Although considered to be a seizure within the meaning of the Fourth Amendment, *see Delaware v. Prouse*, 440 U.S. 648, 653 (1979), a traffic stop is reasonable under *Terry v. Ohio*, 392 U.S. 1, 19–20 (1968), if a police officer's actions in

---

[20]    That the stop may have been a pretext to search the tractor-trailer pursuant to the confidential informant's tip is of no moment. "[T]he constitutional reasonableness of the stop does not depend upon the actual motivations of the officer involved. An officer may stop a motorist for a traffic violation even if, subjectively, the officer's true motive is to investigate unrelated criminal offenses." *United States v. Sanchez-Pena*, 336 F.3d 431, 437 (5th Cir. 2003).

conducting a traffic stop are (1) "justified at its inception" and (2) "reasonably related in scope to the circumstances which justified the interference in the first place." Under the *Terry*'s first prong, the officer's actions in initiating the stop must be supported by specific and articulable facts and rational inferences, or "reasonable suspicion." *Id.* at 21. A police officer may lawfully stop any motorist on reasonable suspicion of a traffic violation. Under the second prong, the officer's actions in prolonging the detention must be "reasonably related to the circumstances that justified the stop, or to dispelling his reasonable suspicion developed during the stop." *United States v. Brigham*, 382 F.3d 500, 507 (5th Cir. 2004).

With regard to the justification for the stop, the parties dispute whether "sailing" mud flaps such as those described by Trooper Cantu amount to violation of Texas' transportation code. Petitioner relies entirely on the language of the code, which requires that a truck have flaps "located and suspended behind the rearmost wheels of the vehicle or the rearmost vehicle in the combination within eight inches of the surface of the highway." TEX. TRANSP. CODE § 547.606. Petitioner contends that the evidence showed that the mud flaps on the tractor-trailer were approximately four inches from the ground and only rose higher while the vehicle was moving. (Brief at 37 (citing Tr. Vol. 8 at 52).) Petitioner argues that Trooper Cantu did not have a reasonable basis to stop his vehicle because "Texas' Vehicle Equipment laws do not speak to 'sailing' mud flaps . . . ." (Brief at 37.)

Respondent points out that that Petitioner provides no authority for his interpretation of the Texas transportation code.[21] Respondent's position finds some support in the appellate

---

[21]     In response, Petitioner argues that he needs no additional authority since the relevant statute is unambiguous in that it says nothing about "sailing" mud flaps. (Docket No. 12 at 12.) Petitioner's argument that the statute is unambiguous is undermined by the regulations implementing the statute, which include language suggesting that mud flaps must continue to perform their function while the vehicle is moving. For example, the regulations require mud

court's ruling on the direct appeal of Petitioner's co-defendant, Iglesias. *See supra* n.4. On appeal, Iglesias challenged the trial court's denial of his motion to suppress, arguing that Trooper Cantu had no reasonable suspicion to conduct a traffic stop. The appellate court overruled this objection, noting that the record supported the trial court's finding "that the troopers had observed that appellant's vehicle was in violation of a provision of the transportation code regulating mud flaps." *Iglesias v. State*, 2013 WL 209226 at *12 (Tex. App.-Corpus Christi-Edinburg Jan. 17, 2013) (citing TEX. TRANS. CODE ANN. § 547.606). The court of appeals concluded that the mud flap violation provided justification for the traffic stop that "pass[ed] muster under the Fourth Amendment." *Id.*

However, it is unnecessary to determine whether Trooper Cantu's understanding of the mud flap requirement was correct. The Constitution does not require "certainty that a violation occurred" before allowing an officer to have reasonable suspicion. *United States v. Castillo*, 804 F.3d 361, 366 (5th Cir. 2015) . "Under *Terry*, if a law enforcement officer can point to specific and articulable facts that lead him to reasonably suspect that a particular person is committing, or is about to commit, a crime, the officer may briefly detain—that is, 'seize'—the person to investigate." *United States v. Hill*, 752 F.3d 1029, 1033 (5th Cir. 2014). The parties dispute whether the mud flaps actually violated Texas law. As Respondent points out, however, the Supreme Court has recently held that "a mistake of law can nonetheless give rise to the reasonable suspicion necessary to uphold the seizure under the Fourth Amendment." *Heien v.*

---

flaps to "remain in proper place back of rear wheels and will be rigid enough to prevent slush, mud, gravel, and other roadway material or debris being transmitted from the vehicle's rear wheels to the windshield of the following vehicle." 37 TEX. ADMIN. CODE § 21.4(g). Although some of the regulations appear to have been adopted subsequent to the stop at issue here, the explanation of the adoption of the current regulations suggests that similar requirements were in place at the time Trooper Cantu's stop. *See* 37 TEX. REG. 2430. In any event, for the reasons that follow above, it is unnecessary to determine whether Trooper Cantu's understanding of the mud flap requirements was correct.

*North Carolina*, 135 S. Ct. 530, 536 (2015).  Given the trial court's finding that Trooper Cantu had reasonable suspicion for the stop based on his belief that there was a mud flap violation, Petitioner's appellate counsel could not have raised a meritorious claim that the trial court erred in denying the motion to suppress.[22]

Petitioner also argues that the circumstances violated *Terry*'s second prong because "the detention of Iglesias and Petitioner impermissibly exceeded its original scope."  (Brief at 39.) The record reflects that both men told officers conflicting travel stories and appeared nervous. Given the officers' suspicions of drug smuggling, the circumstances surrounding the stop indicate that it was not unreasonable for the officers to request permission to search the vehicle. Petitioner has not shown a viable basis on which appellate counsel could have argued a violation of *Terry*'s second prong.

Petitioner has not shown that appellate counsel could have raised a meritorious challenge to the seizure, much less that the results of the appeal would have been different had counsel

---

[22]     Petitioner argues that *Heien* was not decided until 2015 and that, under case law in effect at the time of his appeal, a mistake of law (even if reasonable) would not have supported the traffic stop. (Docket No. 12 at 11.)  Citing *Teague v. Lane*, 489 U.S. 288 (1989), Petitioner contends that the holding in *Heien* is not applicable to his claim that appellate counsel rendered ineffective assistance in failing to raise a Fourth Amendment challenge.   In other words, Petitioner believes that he was prejudiced because he was deprived of the chance to have the state court make an error in his favor.  Petitioner's argument is refuted by the Supreme Court's decision in *Lockhart v. Fretwell*, 506 U.S. 364 (1993).  As the Supreme Court explained, the *Teague* "retroactivity rule was motivated by a respect for the States' strong interest in the finality of criminal convictions," which is not implicated by the claim of a federal habeas petitioner (who is attempting to overturn a conviction).  *Id.* at 372-73.  In rejecting the same argument made by Petitioner here, the Court explained that "an analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective."  *Id.* at 842.  In the instant case, there was nothing unfair or unreliable about the trial court's ruling to allow evidence obtained as a result of Trooper Cantu's stop since that stop did not in fact violate Petitioner's constitutional rights (as *Heien* makes clear).  Petitioner is attempting to obtain "a windfall to which the law does not entitle him." *Lockhart*, 506 U.S. at 842-43.

done so.  Accordingly, the state court was not unreasonable in denying Petitioner's ineffective-assistance-of-counsel claim regarding appellate counsel's failure to raise a Fourth Amendment challenge to the stop.

### 4.    Failure to Challenge the Sufficiency of the Evidence (Claim Eight).

In his eighth ground for relief, Petitioner returns to his trial argument that his presence in the tractor-trailer itself provided an insufficient basis for the jury to find that he knowingly possessed the large amount of marijuana found in the trailer.  The State of Texas charged Petitioner with possession of marijuana in an amount of more than 2,000 pounds.  (Docket No. 3-6, Clerk's Record at 2.)  Under Texas law, a person commits the offense of possession of marijuana "if the person knowingly or intentionally possesses a useable quantity of marijuana." TEX. HEALTH AND SAFETY CODE ANN. § 481.121 (West 2015).  "Possession" is defined as "actual care, custody, control, or management." *Id.* at § 481.002 (38).  "To support a conviction for possession, the state must show that the accused exercised actual care, custody, or control over the substance, that he or she was conscious of his or her connection with it, and that the accused possessed the substance knowingly or intentionally." *Hudson v. State*, 128 S.W.3d 367, 374 (Tex. App.—Texarkana, 2004, no pet.).

Petitioner's trial counsel challenged the sufficiency of the evidence presented at trial. After the State rested, the defense moved for a directed verdict because the State had allegedly failed to prove an element of the offense, namely Petitioner's knowledge of the marijuana.  The trial court denied the motion and found that the circumstantial evidence was sufficient for a jury to determine the question of knowing possession.

In seeking federal habeas relief, Petitioner contends that appellate counsel should have argued that the evidence was legally insufficient for a jury to find him guilty beyond a reasonable

doubt. Petitioner emphasizes the paucity of evidence suggesting that he knew that he was transporting marijuana. In doing so, Petitioner makes numerous arguments and alleges various weaknesses in the State's case. Petitioner argues that "the State presented no evidence that Petitioner was present when the trailer was loaded, or that he was involved either directly or indirectly with the loading. There was no evidence as to where, when, or how it was loaded." (Brief at 41.) According to Petitioner, only weak inferences support a finding that he knew he was transporting drugs. Petitioner questions the reliability of, and points to contradictions in, the tip received from the confidential informant.

Petitioner also contends that errors, such as those raised elsewhere in his habeas petition, contributed the evidentiary insufficiency. For instance, Petitioner contends that the trial court should have precluded references to the informant based on the Confrontation Clause. Petitioner points to gaps in the evidentiary record and argues that the record does not show that he discussed with his co-defendant that they would be transporting drugs. In addition, Petitioner presents arguments and affirmative evidence that trial counsel did not put before the jury. Petitioner particularly emphasizes an affidavit which reflects that drug cartels sometimes use "blind mules." (*See* Docket Entry No. 1-3, Appendix at 67.)[23] Petitioner claims that appellate counsel was constitutionally deficient for not using those arguments to raise an insufficiency-of-the-evidence claim on direct appeal.

Courts analyze claims challenging the sufficiency of the evidence under the standard set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). In *Jackson*, the United States Supreme Court held that, in assessing such a claim, "the relevant question is whether, after viewing the evidence

---

[23] Petitioner presents a lengthy affidavit from by an FBI special agent that was used to establish probable cause for arrest in a different case. As discussed in the next section of this report, see infra Part III.C., this affidavit provides little—if any—support for Petitioner's claims.

in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319. Accordingly, "[t]he *Jackson* inquiry 'does not focus on whether the trier of fact made the *correct* guilt or innocence determination, but rather whether it made a *rational* decision to convict or acquit.'" *Santellan v. Cockrell*, 271 F.3d 190, 193 (5th Cir. 2001) (quoting *Herrera v. Collins*, 506 U.S. 390, 402 (1993)) (emphasis added); *see also Cavazos v. Smith*, 132 S. Ct. 2, 4 (2011) ("[A] federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court . . . . Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold.").

AEDPA generally augments the deferential *Jackson* analysis, making for a doubly high barrier to federal habeas relief. *See Coleman v. Jackson*, 132 S. Ct. 2060, 2062 (2012); *Perez v. Cain*, 529 F.3d 588, 599 (5th Cir. 2008). Here, the combination of AEDPA and the traditional deference paid counsel's efforts in *Strickland* claims "suggests an additional layer of deference on top" of a stand-alone insufficiency claim. *Smith v. Thaler*, 526 F. App'x 395, 410 (5th Cir. 2013). Petitioner must show that the state court was not reasonable in deciding that appellate counsel was not ineffective for failing to raise a rarely successful insufficiency-of-the-evidence claim.

Petitioner highlights weaknesses in the State's case and proposes interpretations of the evidence in a manner favoring the defense. If appellate counsel had challenged the sufficiency of the evidence, however, the *Jackson* framework would not allow the reviewing court to construe the evidence as Petitioner does in his briefing. The appellate court would review any insufficiency-of-the-evidence claim in a light most favorable to the prosecution. In doing so, the

appellate court would also frame Petitioner's arguments in the context of its own legal precedent. The Texas courts have recognized a "valuable cargo link where a jury can infer knowledge of the controlled substance when it is considered valuable." *Santiesteban-Pileta v. State*, 421 S.W.3d 9, 14 (Tex. App. 2013, pet. ref'd); *see also Menchaca v. State*, 901 S.W.2d 640, 652 (Tex. App.-El Paso 1995, pet. ref'd); *Castellano v. State*, 810 S.W.2d 800, 806 (Tex. App.-Austin 1991, no pet.). The jury in this case was well aware that the cargo with which Petitioner had been entrusted was extremely valuable. The jury could rationally infer that Petitioner would not have been entrusted in taking such a valuable load of drugs if he was truly unaware that he was doing so.

The evidence presented at Petitioner's trial, viewed in the light most favorable to the prosecution and the jury's verdict, included the following:

- Petitioner was not just a passenger in the tractor-trailer, but a co-driver who possessed a commercial driver's license;

- After arriving in Edinburg, Texas, on the evening of Sunday, August 16, 2009, Petitioner and Iglesias spent over 12 hours resting in the sleeper berth of the tractor;

- At around noon on Monday, August 17, Petitioner drove the tractor-trailer to Loop Cold Storage in McAllen, Texas, where pallets of fruit cups were loaded into the trailer and a seal was placed on the trailer doors;

- The pallets of fruit cups loaded at Loop Cold Storage did not contain marijuana;

- As a commercial truck driver, Petitioner was responsible for the cargo they were transporting;

- After receiving their legitimate cargo, Petitioner and Iglesias did not begin driving to the cargo's intended destination in Pennsylvania, but rather they remained in Edinburg for almost a full extra day (about 20 hours);

- Due to the nature of the cargo, Petitioner and Iglesias had to run the refrigeration unit on the trailer once it was loaded, which resulted in additional expense (from fuel consumption) due to their delayed departure;

- According to the log that Petitioner was required to keep as a commercial truck driver, he remained with the tractor-trailer at all times—either in the sleeper berth or "on duty not driving"—after it was loaded at Loop Cold Storage,;

- At around 1:00 p.m. on Tuesday, August 18, Trooper Cantu stopped the tractor-trailer;

- A search of the trailer revealed about 2,400 pounds of marijuana concealed within the pallets of fruit cups;

- The marijuana must have been loaded into the tractor-trailer sometime between about 4:00 p.m. on Monday when the tractor-trailer left Loop Cold Storage with the legitimate load of fruit cups and 1:00 p.m. the next day when law enforcement officers found the marijuana in the trailer;

- The marijuana found in the trailer was worth about $1 million;

- Drug traffickers are not willing to risk placing such valuable loads of drugs in a commercial vehicle where the truck driver is not aware he is transporting drugs;

- In transporting drugs in commercial vehicles, drug traffickers use secure locations to load and unload the drugs so that the valuable loads are not lost (which would happen, for example, where a an innocent truck driver delivers a tractor-trailer containing narcotics to a Wal-Mart distribution center);

- Bypassing the seal on the doors of the tractor-trailer, removing the legitimate load of fruit cup pallets, concealing the marijuana within the fruit cup pallets, and reloading the tractor-trailer would have taken significant time and effort;

- Organizations transporting large quantities of drugs use various individuals in different capacities (including packaging, loading, driving, etc.);

- Petitioner and Iglesias must have either taken the tractor-trailer to the unknown location where the drugs were loaded into the trailer or they relinquished control of their tractor-trailer (loaded with a valuable cargo of fruit cups) to someone else—neither of which is reflected in the logs;

- To insure successful delivery of the drugs, the drug traffickers would have had to arrange for Petitioner and Iglesias to take the tractor-trailer to a secure location where the drugs could later be off-loaded (or to relinquish control of the tractor-trailer while someone else did so), before delivering the legitimate load of fruit cups to its destination in Pennsylvania;

- Petitioner and Iglesias both appeared very nervous when they were stopped by DPS troopers;

41

- Petitioner and Iglesias gave conflicting information about their activities and working relationship; and

- Petitioner told officers that they had spent the previous night in a hotel because they were "tired," although this statement was inconsistent with the log books and seems suspect in light of the extended period of time that they had already spent resting in the tractor-trailer's sleeper berth.

As shown by these facts and circumstances, the record reflects sufficient circumstantial evidence from which the jury could have reasonably found Petitioner guilty.[24]   Taking into account the deference that must be accorded to counsel's selection of issues to raise on appeal, Petitioner's appellate counsel was not constitutionally deficient in deciding to forego a questionable challenge to the sufficiency of the evidence.   And given the additional layer of deference due to the state court's application of the Strickland standard, Petitioner's eighth ground for relief lacks merit. *See* 28 U.S.C. § 2254(d)(1).

## C.   Prosecutorial Misconduct (Claim Five).

Petitioner claims that the prosecution engaged in misconduct during closing arguments. As part of the State's evidence, a DPS Investigator testified that it was "too much of a risk for the owner" of the marijuana to allow an unknowing driver to transport such a valuable shipment. (Docket No. 3-19, Tr. Vol. 8 at 206.)   During closing argument, the defense argued that the State had failed to prove the knowledge element of the charged offense. (Docket No. 3-21, Tr. Vol. 9 at 56-66.)   In response, the prosecutor argued that Petitioner must have known about the drugs

---

[24]      Petitioner's co-defendant, Iglesias, was tried separately, and the State presented virtually the same witnesses and evidence during his trial.  On appeal, the state appellate court rejected Iglesias' claim that the evidence was insufficient to support his conviction. *Iglesias v. State*, 2013 WL 209226 at *3-4 (Tex. App.-Corpus Christi-Edinburg Jan. 17, 2013).  The appellate court pointed to various types of circumstantial evidence and concluded that "the logical force of the links, alone and in combination, demonstrates that appellant's connection to the marijuana was more than merely fortuitous—that appellant was not simply an innocent bystander." *Id.* at *4 (citation omitted).

because the owner of the drugs would not put such valuable merchandise into the hands of someone who did not know that they had it. (*Id.* at 76.)

Petitioner argues that "[b]ecause of the extensive cooperation between federal and state agencies investigating the smuggling of marihuana across the Mexico-Texas boarder generally, and because of the extensi[ve] cooperation between federal and state agencies specifically in the instant case, the FBI's knowledge that Mexican smugglers frequently use 'blind mules' to transport large quantities of marihuana must be imputed to the state prosecutor." (Brief at 28-29.) Petitioner supports this argument with a probable cause affidavit filed in an unrelated federal criminal case in which an FBI agent explained a particular scheme involving drug smugglers who placed drugs in "the trunks of unsuspecting drivers' vehicles." (Docket Entry No. 1-3, Appendix at 67 ¶ 9.) Petitioner argues that, in light of this affidavit, the prosecution engaged in misconduct by allowing the DPS narcotics agent to testify that Petitioner must have known that he was transporting drugs due to valuable load of marijuana hidden within the pallets of fruit cups.

When a prisoner alleges prosecutorial misconduct, a reviewing court asks whether the prosecutorial actions "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). Only in the most egregious situations will a prosecutor's improper conduct violate constitutional rights. *Ortega v. McCotter*, 808 F.2d 406, 410-11 (5th Cir. 1987). Petitioner must show "that the prosecutor's misconduct was persistent and pronounced or that the evidence of guilt was so insubstantial that the conviction would not have occurred but for the improper remarks." *Geiger v. Cain*, 540 F.3d 303, 308 (5th Cir. 2008).

Petitioner's reliance on the FBI agent's affidavit to allege prosecutorial misconduct is—at best—a stretch.  There are several reasons this is so.  First, although a court may generally take judicial notice (including sua sponte notice) of publicly-filed court records, *see* FED. R. EVID. 201, it is questionable whether imputing notice of the contents of the affidavit to the State prosecutor is appropriate under the circumstances here.  The affidavit in question was filed in order to provide probable cause to support a criminal complaint filed in the El Paso Division of the Western District of Texas.  As is apparent from the criminal case number, this complaint was one of over 3,000 criminal matters filed in federal court in El Paso in 2011 (as of July of that year).  Similarly, thousands of complaints, search warrants, and other criminal matters are filed every year in the McAllen Division of the Southern District of Texas, not to mention the thousands of similar matters filed in other Texas federal courts every year.  Absent a showing that the information in this particular affidavit is (or should be) generally known to state prosecutors, it would be inappropriate to assume that the prosecutor in Petitioner's case was familiar with information found in one of many thousands of affidavits filed every year in criminal matters in Texas federal courts.

Second, and perhaps more to the point, this affidavit does not purport to suggest that drug traffickers routinely use "blind mules" (an expression not found in the affidavit) to transport narcotics in tractor-trailers.  Rather, the FBI agent describes a specific scheme in which drugs were transported across the border in passenger vehicles.  (Docket Entry No. 1-3, Appendix at 67 ¶ 9.)  To carry out this scheme, drug traffickers paid teenagers in Mexico to identify working professionals and students living in Mexico who daily cross into the United States using a rapid inspection crossing card (which allowed them to use an express lane in crossing the port of entry into the United States).  Once such daily border crossers were identified, the teenagers hired by

the drug traffickers would write down the vehicle identification number for their vehicles.  The drug traffickers provided the VIN numbers to a professional locksmith, who was paid to make two keys that would allow access to the trunks of each vehicle.  One of the keys was then used by a Mexico-based co-conspirator to covertly open the trunk of each vehicle during the night and place two duffle bags containing marijuana in the trunk, along with a GPS tracker.  After the border crosser drove into the United States, a U.S.-based co-conspirator would locate the vehicle parked at a school or place of work and use the second key to open the trunk and retrieve the duffle bags containing the drugs.

This scheme is materially different from the situation in Movant's case, which involved loading 2,400 pounds of marijuana into a tractor-trailer to be transported across the county.[25] Nothing in the FBI agent's affidavit suggests that a similar scheme is commonly used to transport large quantities of drugs in tractor-trailers by unknowing commercial drivers.

Third, the prosecutor's closing argument in Petitioner's case is fully supported by the evidence admitted at trial.  The State presented expert testimony from an experienced commercial truck driver and from law enforcement officers familiar with the practices of drug traffickers using tractor-trailers to transport narcotics.  That evidence supported the prosecutor's argument that drug traffickers would not likely risk such a large and valuable load of marijuana to an unknowing driver.

Fourth, and finally, the Fifth Circuit has repeatedly found that the amount of marijuana can be a factor in proving a defendant's knowledge, observing that "it is unlikely that a drug smuggler would entrust such valuable cargo to an unsuspecting person." *United States v. Perez*,

---

[25]  As the prosecutor noted during closing argument in Petitioner's trial, it took significant time and effort to conceal the marijuana in the pallets of fruit cups and then re-load the pallets into the trailer: "This is not a couple of bundles thrown in the back." (Docket No. 3-22, Tr. Vol. 9 at 74.)

488 F. App'x 841, 843 (5th Cir. 2012); *see also United States v. Acosta-Guerrero*, 431 F. App'x 259, 262 (5th Cir. 2011) ("The marijuana's value permitted for the reasonable inference that Acosta would not have been entrusted with the valuable cargo unless he was part of the drug conspiracy."); *United States v. Abuhasan*, 402 F. App'x 905, 907 (5th Cir. 2010) ("The amount—nearly 400 kilograms—and value—$701,000—of the marijuana also supports the conclusion that Abuhasan knew the marijuana was in the trailer because the jury could reasonably have inferred that he would not have been entrusted with such extremely valuable cargo without his knowledge."); *United States v. Villarreal*, 324 F.3d 319, 324 (5th Cir. 2003) ("One example of circumstantial evidence which may be probative of knowledge is the value of the drug being transported."). It would be strange indeed to conclude that the prosecutor in Petitioner's case engaged in misconduct in making an argument that the Fifth Circuit has repeatedly recognized as valid.

Because Petitioner has not shown that the prosecution engaged in misconduct, much less that the arguments unfairly harmed the defense, the Court of Criminal Appeals' rejection of this claim was not contrary to, or an unreasonable application of, federal law. *See* 28 U.S.C. § 2254(d)(1).

## IV. CONCLUSION

For the foregoing reasons, the undersigned recommends that Respondent's Motion for Summary Judgment (Docket No. 9) be GRANTED, that Petitioner's § 2254 habeas petition (Docket No. 1) be DENIED, and that this action be DISMISSED. For the reasons discussed below, it is further recommended that Petitioner be denied a certificate of appealability.

## CERTIFICATE OF APPEALABILITY

An appeal may not be taken to the court of appeals from a final order in a habeas corpus proceeding "unless a circuit justice or judge issues a certificate of appealability." 28 U.S.C. § 2253(c)(1)(A). Although Petitioner has not yet filed a notice of appeal, the § 2254 Rules instruct that the District Court "must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11, RULES GOVERNING SECTION 2254 PROCEEDINGS. Because the undersigned recommends the dismissal of Petitioner's § 2254 action, it is necessary to address whether Petitioner is entitled to a certificate of appealability (COA).

A COA "may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "The COA determination under § 2253(c) requires an overview of the claims in the habeas petition and a general assessment of their merits." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003). To warrant a COA as to claims denied on their merits, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see also United States v. Jones*, 287 F.3d 325, 329 (5th Cir. 2002) (applying *Slack* standard to a COA determination in the context of a habeas corpus proceeding). An applicant may also satisfy this standard by showing that "jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327; *see also Jones*, 287 F.3d at 329. As to claims that a district court rejects solely on procedural grounds, the prisoner must show both that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484.

Here, Petitioner's § 2254 claims should be dismissed on their merits. For the reasons explained in this report, the undersigned believes that reasonable jurists would not find debatable the conclusion that all of Petitioner's claims lack merit, nor are the issues presented adequate to deserve encouragement to proceed further. Accordingly, Petitioner is not entitled to a COA.

## **NOTICE TO THE PARTIES**

The Clerk shall send copies of this Report and Recommendation to Petitioner and counsel for Respondent, who have fourteen (14) days after receipt thereof to file written objections pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file timely written objections shall bar an aggrieved party from receiving a de novo review by the District Court on an issue covered in this Report and, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Court.

DONE at McAllen, Texas on September 14, 2016.

Peter E. Ormsby
United States Magistrate Judge